IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

FILED
AUG 2 2007
U.S. DISTRICT COURT
CLARKSBURG, WV 26301

**RANDY BROOKS,**

    **Plaintiff,**

v.                **Civil Action No. 2:06cv84**
                  **(Judge Maxwell)**

**DR. WATERS, MARTHA BLANCO,
LEWIS BRESCOACH, LT. R. TRYBUS,
CHRISTINE SHAFFER, SUSAN MCCLINTOCK,**

    **Defendants.**

## OPINION/REPORT AND RECOMMENDATION

  On August 28, 2006, the *pro se* plaintiff initiated this case by filing a civil rights complaint against the above-named defendants in their individual and official capacities. On September 25, 2006, the plaintiff was granted permission to proceed as a pauper. Plaintiff paid an initial partial filing fee on October 10, 2006.

  On October 19, 2006, the undersigned conducted a preliminary review of the file and determined that summary dismissal was not warranted at that time. Therefore, the defendants were directed to file an answer to the complaint. On January 30, 2007, the defendants filed a Motion to Dismiss, or in the Alternative, Motion for Summary Judgment. On February 7, 2007, the Court issued a Roseboro Notice advising the *pro se* plaintiff of his right to file material responsive to the defendants' motion. The petitioner filed his Opposition Response to the defendants' motion on March 7, 2007.

  This case is before the undersigned for a report and recommendation on the defendants' motion.

## I. The Complaint

In the complaint, the plaintiff asserts that he began experiencing pain in his stomach in January of 2006. The plaintiff asserts that he consistently complained to medical staff. On July 10, 2006, the plaintiff asserts that he began feeling extreme pain in his stomach and reported to sick call where he was seen by Dr. Waters. The plaintiff contends that Dr. Waters informed him that there was nothing wrong with him.

During the night, the plaintiff contends that the pain in his stomach became so severe that it kept him up all night. Moreover, the pain became persistently worse forcing the plaintiff to report to sick call again on July 12th. The physician assistant ("PA") on duty prescribed the plaintiff pain medication. The next night, a PA drew the plaintiff's blood and scheduled him an appointment with Dr. Waters on July 14, 2006.

On July 14th, the plaintiff reported to sick call and his blood was again drawn. Afterward, the plaintiff passed out unconscious and awoke on an examination table in the lab where he began vomiting in a container tray. The plaintiff contends that there was blood in his vomit and that he alerted defendant Martha Blanco ("Blanco") to this situation when she subsequently entered the room. Upon hearing of the blood in the plaintiff's vomit, defendant Blanco allegedly took the container tray and pushed it directly into the plaintiff's face saying, "there ain't no blood in there, there ain't no blood in there." Then, in a loud and angry manner, Blanco allegedly poured the contents of the container tray on to the plaintiff's face, all the while continuing to yell, "there ain't no blood in there."

After the plaintiff asked Blanco why she poured vomit on his face, Blanco called for Defendant Lewis Brescoach ("Brescoach") to come into the room. When Brescoach entered, he

began telling the plaintiff to "settle down." The plaintiff states that he told Brescoach that Blanco had assaulted him by pouring vomit on his face. Afterward, Brescoach called for Defendant R. Trybus ("Trybus") to come to the medical department immediately.

Before Trybus could arrive, defendant Christine Shaffer ("Shaffer") entered the room and began grabbing the plaintiff and telling him to calm down. The plaintiff asserts that Shaffer was attempting to make it look like the plaintiff was being aggressive toward staff. At that moment, defendant Trybus entered the room and grabbed the plaintiff. The plaintiff asserts that Trybus grabbed and squeezed his face, with his hands over the plaintiff's mouth and nose. Defendant Trybus then allegedly pushed the plaintiff's head down into the mattress and told the plaintiff to stop assaulting staff. Plaintiff asserts that he was suffocating while Trybus held his face down in the mattress. The plaintiff asserts that he was unable to breathe until Trybus loosened his hold and the plaintiff was able to lift his head.

After lifting his head, the plaintiff asserts that he informed Trybus that he was not assaulting staff and that staff had, instead, assaulted him. The plaintiff further told Trybus that he was too weak to assault anyone. Trybus allegedly told the plaintiff that he would be placed in the Segregated Housing Unit ("SHU") unless he calmed down. Plaintiff was then seen by Dr. Waters who decided to send the plaintiff to an outside hospital for testing and treatment.

The plaintiff was subsequently taken to Monongalia General Hospital ("Mon General") in Morgantown, West Virginia, for severe pain in his stomach. Hospital staff administered tests and determined that the plaintiff had two large, bleeding ulcers in his stomach, that he was bleeding internally, that he needed a blood transfusion, and that he would not be alive if he had not been brought in when he was. The plaintiff alleges that he told the hospital staff that the Assistant

Warden, Susan McClintock had not believed that anything was physically wrong with him and that she had refused to send him to an outside hospital even though the plaintiff had been requesting that she do so for months.[1] The plaintiff asserts that had he been taken to an outside hospital earlier, his condition would not have gotten so serious.

With respect to the facts as outlined by the plaintiff in his complaint, the plaintiff makes the followings claims for relief:

(1) excessive force; and

(2) deliberate indifference to serious medical needs.

As relief, the plaintiff seeks a permanent injunction against the defendants requiring them to transfer him to a federal medical center which is equipped to take care of a chronic care level III inmate, a jury trial in which the defendants will have to testify in open court and at which the plaintiff will be permitted to present evidence of the constitutional violations alleged in the complaint, and an award of compensatory damages in the amount of one million dollars.

## II. The Defendants' Motion to Dismiss or for Summary Judgment

In response to the plaintiff's complaint, the defendants seek dismissal of this action on the following grounds:

(1) the plaintiff's claim of excessive force is not exhausted;

(2) to the extent that the plaintiff alleges claims against the defendants in their individual capacities, the plaintiff has failed to show that his constitutional rights were violated;

(3) the plaintiff has to state a claim under the Eighth Amendment;

---

[1] McClintock allegedly told the plaintiff that there was nothing wrong with him that a psychiatrist could not fix.

(4) the plaintiff has failed to show that he suffered any injury as a result of the alleged use of excessive force; and

(5) the defendants are entitled to qualified immunity.

In the alternative, the defendants assert that because of the supporting documentation accompanying their motion, there is no genuine issue as to any material fact and they are entitled to judgment as a matter of law.

## III. The Plaintiff's Opposition to the Defendants' Motion

In his opposition to the defendants' motion, the plaintiff asserts that defendant Trybus placed him in the SHU in retaliation for the filing of this action. The plaintiff further asserts that because of this status, he has been denied access to the courts and to produce exhaustion of his administrative remedy against that defendant.

## IV. Standard of Review

### A. Motion to Dismiss

In ruling on a motion to dismiss under Rule 12(b)(6), the Court must accept as true all well-pleaded material factual allegations. Advanced Health-Care Services, Inc., v. Radford Community Hosp., 910 F.2d 139, 143 (4th Cir. 1990). Moreover, dismissal for failure to state a claim is properly granted where, assuming the facts alleged in the complaint to be true, and construing the allegations in the light most favorable to the plaintiff, it is clear as a matter of law that no relief could be granted under any set of facts that could be proved consistent with the allegations of the complaint. Conley v. Gibson, 355 U.S. 41, 45-46 (1957).

When a motion to dismiss pursuant to Rule 12(b)(6) is accompanied by affidavits, exhibits and other documents to be considered by the Court, the motion will be construed as a motion for

summary judgment under Rule 56 of the Federal Rules of Civil Procedure.

## B. Motion for Summary Judgment

Under the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admission on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying the standard for summary judgment, the Court must review all the evidence "in the light most favorable to the nonmoving party." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The Court must avoid weighing the evidence or determining the truth and limit its inquiry solely to a determination of whether genuine issues of triable fact exist. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In Celotex, the Supreme Court held that the moving party bears the initial burden of informing the Court of the basis for the motion and of establishing the nonexistence of genuine issues of fact. Celotex at 323. Once "the moving party has carried its burden under Rule 56, the opponent must do more than simply show that there is some metaphysical doubt as to material facts." Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The nonmoving party must present specific facts showing the existence of a genuine issue for trial. Id. This means that the "party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Anderson at 256. The "mere existence of a scintilla of evidence" favoring the non-moving party will not prevent the entry of summary judgment. Id. at 248. Summary judgment is proper only "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." Matsushita, at 587 (citation omitted).

## V. Analysis

### A. Excessive Force Claim

Even assuming that the plaintiff's excessive force claim is exhausted,[2] the plaintiff has failed to state a claim upon which relief may be granted and the defendants' motion for summary judgment is due to be granted.

While courts should give deference to a jail official's determination of what measures are necessary to maintain discipline and security, "the unnecessary and wanton infliction of pain" constitutes cruel and unusual punishment which is prohibited by the Eighth Amendment. Whitley v. Albers, 475 U.S. 312, 321-22 (1986). In order for a plaintiff to prove a claim of excessive force, the plaintiff must first establish that "the alleged wrongdoing was objectively 'harmful enough' to

---

[2] Under the Prison Litigation Reform Act (PLRA), a prisoner bringing an action with respect to prison conditions must first exhaust all available administrative remedies. 42 U.S.C. § 1997(e)(a). Exhaustion as provided in § 1997(e)(a) is mandatory. Booth v. Churner, 532 U.S. 731, 741 (2001). A Bivens action is subject to the exhaust of administrative remedies. Porter v. Nussle, 534 U.S. 516, 524 (2002). The exhaustion of administrative remedies "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes," and is required even when the relief sought is not available. Booth at 741. Because exhaustion is a prerequisite to suit, all available administrative remedies must be exhausted *prior to* filing a complaint in federal court. See Porter, 534 U.S. at 524 (citing Booth, 532 U.S. at 741) (emphasis added). Moreover, an inmate may procedurally default his claims by failing to follow the proper procedures. See Woodford v. Ngo, ___ U.S. ___, 126 S.Ct. 2378 (2006) (recognizing the PLRA provisions contain a procedural default component).

The Bureau of Prisons ("BOP") makes available to its inmates a three level administrative remedy process if informal resolution procedures fail to achieve sufficient results. See 28 C.F.R. 542.10, et seq. This process is begun by filing a Request for Administrative Remedy at the institution where the inmate is incarcerated. If the inmate's complaint is denied at the institutional level, he may appeal that decision to the Regional Office for the geographic region in which the inmate's institution of confinement is located. (For inmates confined at FCI-Morgantown, those appeals are sent to the Mid-Atlantic Regional Director in Annapolis Junction, Maryland.) If the Regional Office denies relief, the inmate can appeal to the Office of General Counsel via a Central Office Administrative Remedy Appeal. An inmate must fully complete each level of the process in order to properly exhaust his administrative remedies.

In this case, the plaintiff concedes that his administrative remedies are not exhausted. Nonetheless, the plaintiff asserts that the failure to exhaust his administrative remedies is due to interference in the process by defendant Trybus. Accordingly, it appears that the plaintiff is arguing that exhaustion should be excused as to his claim of excessive force.

establish a constitutional violation." Norman v. Taylor, 25 F.3d 1259, 1262 (4th Cir.1994) (en banc), cert. denied, 513 U.S. 1114 (1995)(quoting Hudson v. McMillian, 503 U.S. 1, 8 (1992)). Second, the plaintiff must show that the prison officials inflicted unnecessary and wanton pain and suffering. Hudson, 503 U.S. at 6; Williams v. Benjamin, 77 F. 3d 756 (4th Cir. 1996).

With regard to prison disturbances, whether unnecessary and wanton pain and suffering was inflicted "ultimately turns on whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.'" Whitley, 475 U.S. at 320-21. In determining whether the defendant acted maliciously and sadistically, the following factors should be balanced: (1) "the need for application of force"; (2) "the relationship between the need and the amount of force that was used"; (3) "the extent of the injury"; (4) the threat reasonably perceived by the responsible official; and (5) "any efforts made to temper the severity of a forceful response." Id. at 321; see also Williams, 77 F. 3d at 762.

Moreover, in the Fourth Circuit, "absent the most extraordinary circumstances, a plaintiff cannot prevail on an Eighth Amendment excessive force claim if his injury is *de minimis.*" Norman, 25 F.3d at 1263.[3] A *de minimis* injury reveals that *de minimis* force was used. Id. at 1262. However, the Fourth Circuit has also acknowledged that in certain circumstances a claim may be made even

---

[3] In Norman, a jail officer began swinging his cell keys in the direction of the prisoner's face when the prisoner became disruptive. The prisoner asserted that he put his hands up to cover his face, and the keys hit his right thumb causing his right hand to swell. The Court ruled that the prisoner sustained *de minimis* injuries proving that *de minimis* force was used.
Further, the Fourth Circuit found in Taylor v. McDuffie, 155 F.3d 479 (4th Cir. 1998), cert. denied, 525 U.S. 1181 (1999), that the detainee's medical records revealed that as a result of the incident, the detainee suffered from "abrasions on his wrists and ankles, slight swelling in the jaw area, tenderness over some ribs and some excoriation of the mucous membranes of the mouth" and that such injuries were *de minimis.*
On the other hand, the United States Supreme Court has found that "bruises, swelling, loosened teeth and a cracked dental plate" are not *de minimis.* Hudson at 10.

if the injury is *de minimis*. Specifically, the Fourth Circuit has stated:

> There may be highly unusual circumstances in which a particular application of force will cause relatively little, or perhaps no, enduring injury, but nonetheless will result in an impermissible infliction of pain. *Cf.* Hudson, 503 U.S. at ----, 112 S.Ct. at 1000 ("diabolic" or "inhuman" physical punishment unconstitutional, regardless of injury). In these circumstances, we believe that either the force used will be "of a sort 'repugnant to the conscience of mankind,'" and thus expressly outside the *de minimis* force exception, see Hudson, 503 U.S. at ----, 112 S.Ct. at 1000 (citations omitted), or the pain itself will be such that it can properly be said to constitute more than *de minimis* injury.

Norman, at 1264, n. 4.

Even accepting the plaintiff's version of the events as true,[4] when defendant Trybus entered the lab, he saw medical staff attempting to hold the plaintiff down and heard them telling the plaintiff to settle down. Although the plaintiff asserts that this scene was staged, and that he was not really causing a disturbance, the relevant inquiry is whether defendant Trybus' actions were reasonable given the circumstances. Here, they obviously were. In addition, even though the plaintiff asserts that he was suffocating while defendant Trybus held him down, plaintiff does not assert any relevant injury, nor has he shown that special circumstances exist which would show that the physical "punishment" inflicted in this case rises to the level of a constitutional violation even without a showing of injury. Thus, without establishing anything more than a *de minims* injury, the plaintiff cannot maintain a claim of excessive force and the defendants are entitled to judgment as a matter of law.

### B. Deliberate Indifference

To state a claim under the Eighth Amendment for ineffective medical assistance, the plaintiff

---

[4] In her declaration, defendant Blanco asserts that Lieutenant Trybus did not use any force to subdue the plaintiff. See Defendants' Exhibit 3.

must show that the defendant acted with deliberate indifference to his serious medical needs. Estelle v. Gamble, 429 U.S. 97, 104 (1976). To succeed on an Eighth Amendment "cruel and unusual punishment" claim, a prisoner must prove two elements: (1) that objectively the deprivation of a basic human need was "sufficiently serious," and (2) that subjectively the prison official acted with a "sufficiently culpable state of mind." Wilson v. Seiter, 501 U.S. 294, 298 (1991).

A serious medical condition is one that has been diagnosed by a physician as mandating treatment or that is so obvious that even a lay person would recognize the need for a doctor's attention. Gaudreault v. Municipality of Salem, Mass., 923 F.2d 203, 208 (1st Cir. 1990), cert. denied, 500 U.S. 956 (1991). A medical condition is also serious if a delay in treatment causes a lifelong handicap or permanent loss. Monmouth County Corr. Inst. Inmates v. Lanzaro, 834 F.2d 326, 347 (3rd Cir. 1987), cert. denied, 486 U.S. 1006 (1988).

The subjective component of a cruel and unusual punishment claim is satisfied by showing that the prison official acted with deliberate indifference. Wilson, 501 U.S. at 303. A finding of deliberate indifference requires more than a showing of negligence. Farmer v. Brennan, 511 U.S. 825, 835 (1994). A prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837. A prison official is not liable if he "knew the underlying facts but believed (albeit unsoundly) that the risk to which the fact gave rise was insubstantial or nonexistent." Id. at 844.

"To establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment, [or lack thereof], must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." Miltier v. Beorn, 896 F.2d 848, 851 (4th Cir. 1990). A mere disagreement between the inmate and the prison's

10

medical staff as to the inmate's diagnosis or course of treatment does not support a claim of cruel and unusual punishment unless exceptional circumstances exist. Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985). A constitutional violation is established when "government officials show deliberate indifference to those medical needs which have been diagnosed as mandating treatment, conditions which obviously require medical attention, conditions which significantly affect an individual's daily life activities, or conditions which cause pain, discomfort or a threat to good health." See Morales Feliciano v. Calderon Serra, 300 F.Supp.2d 321, 341 (D.P.R. 2004) (citing Brock v. Wright, 315 F.3d 158, 162 (2d Cir. 2003)).

The plaintiff medical records show the following with regard to the claims raised in the complaint:

1. When plaintiff arrived at FCI-Morgantown, his medical records showed a history of hypertension, Type 2 diabetes, GERD, and sleep apnea.

2. On January 12, 2006, medical staff conducting an intake screening on the plaintiff.

3. On January 19, 2006, plaintiff was examined by Dr. Waters as part of the initial follow-up to his intake screening. At this examination, the plaintiff made no complaints of pain.

4. On March 6, 2006, the plaintiff reported to sick call at 7:00 a.m. with complaints of abdominal and stomach pain. The plaintiff was examined by defendant Blanco. As a result of his examination, the plaintiff was told to not eat spicy or greasy foods, was given a work idle for three days, and was told to report to Health Services for a follow-up examination on March 8th. Defendant Blanco also ordered a diagnostic test that includes electrolytes, cholesterol, and liver and kidney function tests.

5. At 11:55 p.m. that same day, the plaintiff again reported to sick call complaining of lower

abdominal pain. The plaintiff complained of pain in his right side and lower abdomen that radiated into the lower right side of his back. The plaintiff was examined and his vital signs were all normal. The plaintiff was given a prescription to relieve his pain, advised to drink plenty of fluids, and to return to Health Services in the morning.

6. The plaintiff reported to Health Services on March 7th at 8:00 a.m. still complaining of belly and back pain. The plaintiff reported no vomiting and no bowel or urine problems. The plaintiff was examined for stomach distention and digestive issues. The plaintiff moved without much difficulty and his lab results were normal. The plaintiff was against advised to drink plenty of fluids, avoid caffeine and return to Health Services the next day

7. Later that same day, the plaintiff was again seen by Health Services. At this appointment, the plaintiff complained of sharp pains in his back, but stated that he was able to eat and drink. Although the plaintiff complained of abdominal pain throughout the examination, his digestion was normal and there was no distention or rebound tenderness.

8. The plaintiff returned again that same day with complaints of abdominal and back pain. The plaintiff denied any vomiting, but stated that he had no appetite. No abnormalities were noted and the plaintiff was advised to report to Health Services the next day for further abdominal testing.

9. On March 10, 2006, the plaintiff was seen by medical staff for follow-up complaints of abdominal pain. The plaintiff was examined and treated for possible muscle strain. The plaintiff was given an injection, a convalescence slip and was advised to take Motrin three times a day. The plaintiff was also scheduled an appointment with Dr. Waters.

10. At 1:00 p.m. that same day, the plaintiff was re-examined by Dr. Waters. At that time, the plaintiff stated that the pain had lessened, that he was able to sleep that afternoon, and that he had

been able to eat earlier in the day. The plaintiff did not have a fever, chills or sweats and stated that he was having regular bowel movements with no blood detected. Dr. Waters noted that the plaintiff did not appear to be in acute distress at the time and that he was not holding his right flank as he had been earlier in the day. The plaintiff reported pain reduction when pressure was applied to his right flank. Dr. Waters noted that the plaintiff's pain did not appear to be of visceral origin and that all his labs had been normal to date. Dr. Waters noted that the plaintiff's pain was likely caused by muscle strain and instructed the plaintiff to continue Motrin as needed and to report to Health Services if his pain worsened or persisted.

11. On March 13, 2006, the plaintiff was sent to Health Services by his Counselor after complaining of severe stomach pain. Medical staff noted that the plaintiff had been overusing his prescription of Ibuprofen. In addition, it was noted that the plaintiff was walking in an upright position without difficulty and that all labs were normal. The plaintiff was observed or examined four more times that day, was given an injection for his pain, and was scheduled for an Intravenous Pyelogram ("IVP") to rule out kidney stones.

12. On March 15, 2006, plaintiff was sent out for his IVP.

13. On March 20, 2006, the plaintiff received the results of his IVP. His IVP was negative for kidney stones.

14. The plaintiff next reported to Health Services on April 19, 2006 for a routine follow-up. At that time, the plaintiff reported no abdominal pain and stated that he was trying to exercise as much as possible. The plaintiff was examined by Dr. Waters who did not find any abnormalities.

15. On June 14, 2006, the plaintiff reported to Health Services complaining of dull stomach pain. The plaintiff requested to be tested for an enlarged prostate and hyperplasia. The plaintiff

13

reported no nausea, vomiting, weight loss or diarrhea. Plaintiff was examined by defendant Blanco who determined that his abdomen appeared normal. Plaintiff was advised to apply warm compresses to his lower abdomen as needed. The plaintiff was also advised to lose weight and follow-up with any other concerns.

16. On June 27th and 29th, the plaintiff reported to Health Services for matters not related to abdominal pain.

17. On June 30, 2006, the plaintiff reported to Health Services with complaints of blurred vision and abdominal pain. The plaintiff did not report nausea, vomiting or diarrhea. The plaintiff was examined and his vital signs were normal. The plaintiff was instructed to follow-up on his abdominal pain on July 22, 2006.

18. On July 5th the plaintiff reported to Health Services complaining of abdominal pain with constipation. A Hemocult was performed to check for blood in the rectum and was returned with normal results. The plaintiff was scheduled for a follow-up and was advised to drink plenty of liquids and to take Tylenol four times a day. Another CBC test was ordered to determine whether the plaintiff was anemic and might have an ulcer.

19. On July 6, 2006, the plaintiff returned to Health Services complaining of pain all over his stomach. The plaintiff stated that he was "taking aspirin like crazy," but that he had no nausea or vomiting. An examination of the plaintiff's stomach was normal. The plaintiff was advised to stop taking Tylenol over concerns of misuse and to instead take Maalox.

20. On July 9th the plaintiff was sent to Health Services by his Counselor with complaints of abdominal pain, weakness on his left side and temporary vision loss. An examination showed slight weakness on the plaintiff's left side, an EKG was conducted and the results were within

normal limits. The plaintiff was scheduled to return the next morning.

21. On July 10, 2006, the plaintiff was examined by Dr. Waters for abdominal pain radiating into his back, not associated with nausea or vomiting. The plaintiff denied blood in the stool, fever, chills, or sweats. The plaintiff also complained of general weakness in his left side, but denied headaches, slurred speech, or vision problems. The plaintiff was not in acute distress during the examination and the exam failed to show any hemorrhaging or neurological problems. Normal results on the plaintiff's CBC ruled out anemia.

22. At 1:30 p.m. that same day, the plaintiff was seen in his housing unit by defendant Blanco after his cell mate reported seeing him throw up blood and food. Defendant Blanco found no blood in the toilet or sink and plaintiff stated that he had stopped taking aspirin. The plaintiff was transferred to Health Services for further evaluation. That evaluation showed no distention, a Hemocult returned negative results. When the plaintiff was asked to go to the lab, he fell down and started hyperventilating. The plaintiff was immediately moved to urgent care and he opened his eyes after breathing into a paper bag. An IV of saline solution was inserted into the plaintiff's arm and Dr. Waters was informed of the plaintiff's condition by telephone. Dr. Waters instructed defendant Blanco to continue the current course of treatment and to order a BOP and CBC immediately.

23. On July 13th, defendant Blanco noted that the plaintiff was attempting to force himself to throw up. The plaintiff was throwing up small amounts of saliva with small streaks of blood. The plaintiff was advised that forcing himself to throw up could damage his esophagus. The plaintiff became hostile, almost pulled out his IV and spilled some of the saliva on himself. This is the point where the plaintiff asserts that excessive force was used against him.

24. At 4:00 p.m. that same day, the plaintiff complained of pain while urinating, but his urine

15

was clear. The plaintiff also stated that his stomach pain had eased up.

25. At 5:00 p.m. that day, the plaintiff was receiving pain medication and was ambulating well so he was returned to his housing unit. However, medical staff was still awaiting results of the plaintiff's medical tests.

26. On July 14, 2006, Dr. Waters noted a significant decrease in the plaintiff's hemoglobin levels and determined that the plaintiff likely suffered from an "NSAID induced duodenal ulcer." The plaintiff was thereafter referred to Mon General for further treatment and evaluation.

27. The plaintiff was admitted to Mon General that same day. At the time, the plaintiff presented with abdominal pain, bleeding and anemia. The plaintiff was treated by a general surgeon who performed an endoscopy and determined that the plaintiff suffered from two large ulcers in his stomach area. The plaintiff's condition was then stabilized and he was discharged from the hospital on July 19, 2006. At the time of his discharge, it was recommended that the plaintiff follow-up with the general surgeon in six weeks and that he take Carafate and Protonix for treatment of his ulcers.

28. On August 3, 2006, the plaintiff was sent to the surgical center for follow-up care. The plaintiff reported some pain, but better than before. The plaintiff stated that he was taking Carafate and Protonix as recommended. Plaintiff was examined by the general surgeon and no abnormalities were found. The general surgeon recommended that the plaintiff undergo an Esophagogastroduodenoscopy.

29. An Esophagogastroduodenoscopy was performed by the general surgeon on August 23th. The procedure revealed that the plaintiff's ulcers had completely healed.

30. Since his stay at Mon General, the plaintiff has reported to Health Services approximately 20 times for follow-up and treatment. On each of these occasions, the plaintiff has

complained of less severe pain that occurs only after eating. Each time the plaintiff has subsequently complained of abdominal pain, he has been evaluated by medical staff and no abnormalities have been found. In addition, the plaintiff has been advised to watch his weight, his food intake and has been given repeated CBC's to monitor his blood levels.

See Memorandum of Law (dckt. 28-2) at Ex. 2 (Declaration of Michael Waters).

Despite the plaintiff's attempt to characterize his claim as one of deliberate indifference, it is clear from the plaintiff's medical records that the defendants have not been indifferent to his needs, deliberate or otherwise. Rather, it is clear that the plaintiff's complaints of pain have all been thoroughly evaluated and treated. It appears then, that the plaintiff really takes issue with the type of treatment he received. In other words, the plaintiff merely disagrees with the prison's medical staff as to his diagnosis or course of treatment. However, such a claim is more appropriately a tort claim and as already noted, does not rise to the level of a constitutional violation. Wright v. Collins, supra. Accordingly, the plaintiff has failed to state a claim for which relief may be granted and the defendants are entitled to judgment as a matter of law.

## VI. Recommendation

For the foregoing reasons, the undersigned recommends that the defendants' Motion to Dismiss, or in the Alternative, Motion for Summary Judgment (dckt. 28) be **GRANTED** and the plaintiff's complaint be **DISMISSED with prejudice.**

Within ten (10) days after being served with a copy of this recommendation, any party may file with the Clerk of Court written objections identifying those portions of the recommendation to which objection is made and the basis for such objections. A copy of any objections should also be submitted to the Honorable Robert E. Maxwell, United States District Judge. Failure to timely file

objections to this recommendation will result in waiver of the right to appeal from a judgment of this Court based upon such recommendation. 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984).

The Clerk is directed to mail a copy of this Opinion/Report and Recommendation to the *pro se* plaintiff.

DATED: ~~July~~ August 2, 2007.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE